IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 23, 2026 at Knoxville

**STATE OF TENNESSEE v. KYLE GOLDEN**

**Appeal from the Criminal Court for Shelby County**
No. 22-05057          Jennifer Fitzgerald, Judge

_____

**No. W2025-00959-CCA-R3-CD**
_____

The Defendant, Kyle Golden, entered a guilty plea to one count of aggravated assault and three counts of child abuse. The Shelby County Criminal Court accepted the Defendant's guilty plea and, following a sentencing hearing, denied the Defendant's request for judicial diversion and imposed an effective sentence of five years' supervised probation. The Defendant appeals, arguing that the trial court erred by denying his request for judicial diversion. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Joseph McClusky, Memphis, Tennessee, for the appellant, Kyle Golden.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and William Wetter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.      FACTUAL AND PROCEDURAL HISTORY**

On December 1, 2022, a Shelby County grand jury returned a four-count indictment charging the Defendant with one count of aggravated assault by strangulation and three counts of child abuse relating to offenses occurring between June 2 and June 14, 2022, involving a four-year-old victim. On March 4, 2025, the Defendant entered guilty pleas to

each count as charged in the indictment; however, there was no agreement as to the appropriate sentence.

The trial court held a sentencing hearing on April 9, 2025. The State introduced video recordings of the offenses, dated June 3, June 7, and June 13, 2022, as well as a timeline of the offenses.[1] The video recordings depicted the Defendant and the victim in a classroom. Other children and staff were present in each recording. Throughout the recordings, the Defendant pinched and held his hand against the victim's face and nose, bent the victim's arms behind his back, manipulated the victim's fingers, twisted the victim's ear, physically redirected the victim's head and held it in place, forcibly moved the victim by pulling his neck, and struck the victim in the face and head with his hands and a clipboard.

The Defendant testified that he was twenty-seven years old at the time of the offenses. He stated that he had known he was "different from other people" from a very young age and that he was diagnosed with autism after the offenses. He averred that, due to his autism diagnosis, he was unsure whether he could "always interpret when people are feeling sorrow, pain, or distress."

The Defendant testified that he held a bachelor's degree in psychology from the University of Memphis and that, as a student, he interned at Transformations Autism Treatment Center ("Transformations"). Following his graduation, the Defendant was hired by Transformations as a registered behavioral technician. The Defendant testified that he completed a training course regarding how to work with and treat nonverbal autistic children. He stated that he frequently worked with such children and that he was supervised. He further stated that he was supervised while the offenses were committed and that he was neither stopped nor chastised by his supervisors.

The Defendant testified that the victim was a four-year-old nonverbal autistic boy who was enrolled as a student at Transformations. The Defendant agreed that he had reviewed the video recordings of the offenses and stated that he felt "bad" about his actions. He characterized his behavior as inappropriate and "rougher than necessary."

On cross-examination, the Defendant stated that he had been bullied as a child. He initially testified that he was unsure what he was thinking when he committed the offenses, but he later stated that he thought he was doing "what [was] expected of [him]" and that he was "expected to get results." He stated that he had believed that "if [he] was doing

---

[1] The facts giving rise to the Defendant's charges in this case are uncontested. Nevertheless, we note that the record does not include a transcript of the Defendant's guilty plea submission hearing. Accordingly, our summary of the factual basis for the Defendant's charges is gleaned largely from the video recordings of the offenses and the evidence adduced at the April 9, 2025 sentencing hearing.

anything wrong, then someone in the room would have stopped [him]." He agreed that he "may have taken it too far," but he averred that he believed he was following his supervisors' instructions. He further agreed he would not want to be treated in the same manner as he treated the victim.

On redirect examination, the Defendant described the training he received from Transformations regarding how to work with and treat nonverbal autistic children. He recalled that he was instructed to use "hand-over-hand instruction," which involved taking a child's hand and guiding it through the performance of a task. He also stated that he had been trained to "pull" or "manipulate" a child's finger to get the child's attention. He testified that he was also trained to physically "redirect" a child's head towards an assigned task when the child attempted to avoid following instructions. He stated that it was "sometimes necessary to physically manipulate" a child's arm as a form of instruction or to place his hand over a child's mouth or nose to prevent the child from biting or otherwise harming others. He similarly stated that he was instructed to restrain violent children by pulling their arms behind their backs. On recross-examination, the Defendant agreed that he "clamp[ed]" the victim's nose and covered the victim's mouth, but he stated that he believed he did so because the victim was biting or spitting.

The Defendant's father testified that the Defendant was "slow to talk" around age three and that he stopped making eye contact or desiring physical contact around age five. The Defendant's father thereafter began researching the Defendant's symptoms and determined that the Defendant was "on the Asperger's [spectrum] somewhere." He stated that he did not pursue an autism diagnosis for the Defendant because, at the time, a child needed to present five of ten "known symptoms" and because the Defendant presented only three symptoms. The Defendant's father also noted that, at the time, the only treatment for a child diagnosed with Asperger's syndrome was to provide them with "quiet time" when needed.

The Defendant's father recalled that the Defendant performed well academically. He noted that the Defendant attended speech therapy in elementary school and was bullied in high school. He also noted that the Defendant's social circle "narrowed" as the Defendant aged.

The Defendant's father testified that the Defendant lived with him and the Defendant's mother and followed a "very strict schedule." He averred that the Defendant typically understood instructions "literally" and that, accordingly, he provided the Defendant with "very specific instructions" when asking him to perform tasks around the home. He stated that the Defendant tended to "hyper[-]focus" on assigned tasks and would complete them any way he could. He stated that the Defendant often was unable to "see the details" outside of the subject of his "hyper[-]focus." He further testified that the

Defendant cared for the family's pet dogs and that he had never seen the Defendant harm another person or animal.

The victim's father read his written statement into the record. The victim's father described the victim as a nonverbal autistic child who was unable to "articulate emotions, fear, concerns, or danger." He described the offenses as devastating to his family and the Defendant's actions as torture. He stated that the Defendant had slapped the victim in the face "as if he were a grown man" and grabbed the victim by his nose "with the force of punching him" so the victim could not breathe or cry. He noted that the victim was "light-skinned" and recalled noticing a discoloration of the victim's skin around the time of the offenses. The victim's father stated that he had believed the discoloration was simply the victim's skin becoming darker complected, but he that he later realized the discoloration was due to the Defendant's "slapping" the victim.

On cross-examination, the victim's father testified he had reviewed the video recordings of the offenses. He agreed that a supervisor was always present during the offenses. He opined that the Defendant appeared to be "hiding" from the supervisors during the offenses, and he stated that he believed none of the supervisors had intervened because the Defendant had "secluded" the victim by taking him into a corner.

During argument, the Defendant requested judicial diversion. He argued that he was a first-time offender with special needs and that he was not the "typical" offender. The Defendant described the circumstances of the offenses as "horrible" but noted that he had accepted responsibility and expressed remorse for his actions. He argued that the offenses were due to his lack of understanding, knowledge, training, and "ability to perceive."

The State responded that the Defendant knew his actions were wrongful at the time he committed the offenses. The State also noted that the Defendant had studied psychology and contended that he understood "the long-term effects" his actions would have on the victim's welfare. The State contended that the Defendant's behavior was not a "hyper[-]focused activity . . . because he'd been told to treat children like this by an autism center." The State requested that the trial court impose an effective sentence of six years' incarceration; alternatively, a suspended sentence of supervised probation. The State opposed judicial diversion. The trial court took the matter under advisement.

On May 27, 2025, the trial court, after considering the purposes and principles of sentencing, the presentence report, the arguments of counsel, the evidence presented at the hearing, the nature and characteristics of the criminal conduct involved, the applicable mitigating and enhancement factors, the relevant statistical information provided by the Administrative Office of the Courts, the Defendant's testimony, and the Defendant's

potential rehabilitation, denied the Defendant's request for judicial diversion and imposed a suspended sentence of five years' supervised probation.

The trial court accorded the Defendant's amenability to correction "some weight" both in favor of and against his request for judicial diversion. The trial court found that the Defendant had "stayed out of trouble" since the offenses but noted that it was "concerned" that the Defendant was unable to explain "why he did what he did." The trial court noted that the Defendant had been diagnosed with autism but that it had not heard "anything in the hearing that [it] was the cause for why he did what he did."

The trial court described the circumstances of the offense as "very serious." It noted that it had reviewed the video recordings of the offenses and found that the Defendant had "essentially tortured" the victim by striking the victim in the head and "continuously" covering the victim's mouth and restricting his ability to breathe. The trial court further found that the victim only became violent towards the Defendant in self-defense. The trial court further found that the Defendant had abused a position of trust in committing the offenses. The trial court, accordingly, reasoned that the circumstances of the offense weighed heavily against judicial diversion.

The trial court found that the Defendant had no prior criminal record, which it weighed in favor of the Defendant's request for judicial diversion. The trial court also found that the Defendant had graduated from both high school and college and had worked at Transformation for two years. Accordingly, the trial court weighed the Defendant's social history in favor of his request for judicial diversion.

The trial court noted that the Defendant reported his physical health as "good" and his mental health as "fair because of the stress of this case." The trial court also found that the Defendant had been diagnosed with autism. The trial court thus accorded the Defendant's physical and mental health "a little weight" in favor of the Defendant's request for judicial diversion. The trial court reiterated, however, that it was unsure if the Defendant's autism diagnosis was "the cause of why he did what he did."

Regarding the need for deterrence, the trial court reiterated that the Defendant had abused a position of trust. The trial court stated that a "message" needed to be sent, both to the Defendant and to the public, that "you can't abuse kids." The trial court also found that the interest of the public outweighed the Defendant's interest in receiving judicial diversion. Although the trial court noted that the Defendant would likely face difficulties in attaining future employment with a felony conviction on his criminal record, the trial court reasoned that the Defendant should not be permitted to work with children again and that the "public deserves to know that he abused a child." The trial court reiterated that "there's no reason why he did it" and expressed concern that the Defendant could reoffend.

Accordingly, the trial court weighed the ends of justice and deterrence value against the Defendant's request for judicial diversion. After weighing the *Parker* and *Electroplating* factors, the trial court denied the Defendant's request for judicial diversion and imposed a five-year sentence to be served on probation. This timely appeal followed.

## II.   ANALYSIS

On appeal, the Defendant argues the trial court erred by denying his request for judicial diversion. Specifically, he contends that the trial court abused its discretion by according undue weight to his motive and to the trial court's "own inability to understand" his actions. The Defendant notes that he elicited proof of his autism diagnosis, the training he received regarding working with nonverbal autistic children, and his attempts to implement his training. The State responds that the trial court did not abuse its discretion. We agree with the State.

In order to qualify for a grant of judicial diversion, a criminal defendant (1) must plead guilty to or be found guilty of a misdemeanor or a Class C, D, or E felony; (2) must not be seeking diversion for a sexual offense enumerated in Tennessee Code Annotated section 40-35-313(a)(1)(B)(i)(e) or a Class A or B felony; and (3) must not have a prior conviction for a felony or a Class A misdemeanor. Tenn Code Ann. § 40-35-313(a)(1)(B)(i). When a trial court grants a defendant's application for diversion, the defendant's "plea or verdict is held in abeyance and further proceedings are deferred under reasonable conditions during a probationary period established by the trial court." *Rodriguez v. State*, 437 S.W.3d 450, 455 (Tenn. 2014) (citing Tenn. Code Ann. § 40-35-313(a)(1)(A)).

A grant of diversion is not mandatory upon a defendant's qualification under the statute. *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014). Instead, Tennessee Code Annotated section 40-35-313(a)(1)(A) vests the trial court with discretion to grant or deny a qualifying defendant's request for diversion. *Id.* In determining whether to grant or deny diversion, the trial court must consider

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as to others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

*State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (first citing *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); and then citing *State v.*

*Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). The trial court must also weigh each of these factors and place an explanation for its ruling on the record in support of its decision. *King*, 432 S.W.3d at 326. Though the trial court need not recite all the factors on the record, the record nevertheless must indicate that the trial court considered each factor and "identified the specific factors applicable to the case before it." *Id*. at 327.

Judicial diversion is not a sentence; rather, a "grant or denial of judicial diversion is a *decision* to either defer or impose a sentence." *Id*. at 324-25. Given this close relation to sentencing, the appropriate standard of review for a trial court's grant or denial of diversion is an abuse of discretion. *Id*. at 325; *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (holding that sentencing decisions imposed within the appropriate statutory range are reviewed on appeal for an abuse of discretion). Further, so long as the trial court considers the *Parker* and *Electroplating* factors, weighs them against each other, and places its findings on the record, we will presume that its decision is reasonable and will "uphold the grant or denial [of diversion] so long as there is any substantial evidence to support the trial court's decision." *King*, 432 S.W.3d at 326-27. However, when the trial court fails to consider the *Parker* and *Electroplating* factors or place its findings on the record, we will either review its decision de novo or, if more appropriate under the circumstances, remand the issue to the trial court for reconsideration.

In denying the Defendant's request for judicial diversion, the trial court considered and weighed each of the *Parker* and *Electroplating* factors and placed its reasoning on the record. Specifically, the trial court found that the Defendant's amenability to correction weighed somewhat in favor of and also against the Defendant's request for judicial diversion, noting that although the Defendant had "stayed out of trouble" since the offenses, the trial court was nevertheless concerned that the Defendant would reoffend and noted that the Defendant was unable to explain "why he did what he did." The trial court weighed the Defendant's lack of a criminal record and social history in favor of his request for judicial diversion. The trial court accorded the Defendant's physical and mental health "a little weight" in favor of his request for judicial diversion and noted his autism diagnosis in its analysis. The trial court weighed the remainder of the *Parker* and *Electroplating* factors against judicial diversion; it found that the circumstances of the offenses were "very serious" and weighed heavily against the Defendant's request, that there was a need for deterrence for both the Defendant and the public, and that the interests of the public outweighed the Defendant's interest in receiving judicial diversion. Substantial evidence supports each of these findings. Accordingly, we will presume the trial court's denial of diversion was reasonable. *Id*.

The Defendant argues that the trial court abused its discretion because it placed undue weight on "its own inability" to understand the Defendant's actions. The Defendant notes that he elicited proof to explain his actions, including his autism diagnosis, the

- 7 -

training he received regarding working with nonverbal autistic children, and his attempts to implement his training. He also notes that a defendant's motive is not among the factors considered in denying judicial diversion.

To be sure, a trial court may abuse its discretion when it considers and places undue weight upon an irrelevant factor in denying a defendant's request for judicial diversion. *State v. Gobble*, No. E2014-01596-CCA-R3-CD, 2015 WL 12978645, at *6 (Tenn. Crim. App. Aug. 12, 2015), *no perm. app. filed*. Such is not the case here. A defendant's motive in committing an offense is relevant to a trial court's analysis of the circumstances of the offense, as well as his amenability to correction. The nature of the Defendant's proof and arguments made it relevant to the other factors, as well, including the Defendant's mental health. The Defendant's theory of the case was that his autism diagnosis impacted his interactions with the victim; he noted his diagnosis in his opening statement and characterized it as "the problem," contending that it caused "a slight disconnect between him and the rest of the world" and that "to punish him the way we would punish others sends the wrong message to the community." The vast majority of the evidence adduced at the Defendant's sentencing hearing centered around his autism diagnosis, the impact it had on his daily life, and how it may have implicated his interactions with the victim. The trial court determined from the evidence that it was unclear what effect, if any, the Defendant's autism had in causing his abusive behavior toward the Defendant. This was done in the context of considering the Defendant's amenability to correction. The trial court gave "that some weight against [the Defendant]." However, the trial court also considered the Defendant's recent good behavior and gave "that some weight in his favor" regarding amenability to correction. Thus, the trial court did not place undue weight on the court's inability to understand why the Defendant acted as he did. It was not an abuse of discretion for the trial court to wrestle with the Defendant's motivation and the effects of his autism when considering the Defendant's amenability to correction, the circumstances of the offense, and the Defendant's mental health.

The Defendant's argument is largely a disagreement with the manner in which the trial court considered and weighed the Defendant's proof of his diagnosis. But the trial court acts as the trier of fact in a sentencing proceeding and is entrusted with determining issues of witness credibility and evaluating the weight of the evidence. *State v. Melvin*, 913 S.W.2d 195, 202 (Tenn. Crim. App. 1995). The appellate court must defer to the trial court's findings of fact unless the record clearly preponderates against them. *Id*. (citing *State v. Raines*, 882 S.W.2d 376, 383 (Tenn. Crim. App. 1994).

In this case, the trial court considered the testimony and evidence presented and did not accredit the Defendant's proof regarding the impact his autism had upon his actions, and the Defendant does not direct our attention to any proof which preponderates against this finding of fact. Regardless, although the trial court's determination regarding the

Defendant's autism diagnosis was certainly an aspect of its weighing of the *Parker* and *Electroplating* factors, it did not dominate its analysis. As the Defendant notes, the trial court mentioned the Defendant's autism diagnosis in its analysis of the Defendant's amenability to correction, his mental and physical health, and its weighing of the interests of the public and the Defendant's interests. However, it also considered the Defendant's lack of subsequent criminal behavior, his reports of good physical health and fair mental health, and the competing interests of the Defendant in securing future employment and of the public in avoiding any subsequent offenses and in knowing that the Defendant had previously abused a child. The trial court found that the circumstances of the offense weighed heavily against granting diversion. In other words, the trial court appropriately considered the relevant evidence and analyzed it under the *Parker* and *Electroplating* factors. Accordingly, the trial court did not abuse its discretion in denying the Defendant's request for judicial diversion, and the Defendant is not entitled to relief.

### III. CONCLUSION

Following our review of the record and based on the foregoing analysis, we affirm the judgments of the trial court.

s/ *Steven W. Sword*
STEVEN W. SWORD, JUDGE